## Southern District of Florida

### U.S. Federal Building and Courthouse
### 299 East Broward Boulevard #108
### Fort Lauderdale, FL 33301

FILED BY_____*PC*_____D.C.

*Mar 26, 2024*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

**: DOCKET No**

**Larry Baumhor, Pro Se**      **:  Date: March 22, 2024**

_____                **:  March Term 2023**

**PLAINTIFF**                          **:**

                                            **:**

    **vs.**                               **:**

                                            **:**

**Andrew Baumhor**              **:**

_____

   **DEFENDANT**

# PETITION FOR RELIEF FROM THE SUPREME COURT OF FLORIDA AND THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, FOURTH DISTRICT FOR VIOLATING PLAINTIFF'S CONSTITUTIONAL RIGHTS

1. The Plaintiff herein is Larry Baumhor residing at 2006 Griffith Street, Philadelphia, PA 19152. (215) 742-5736

2. The Defendant herein is Andrew Baumhor the son of Larry Baumhor and is currently residing at 10533 Cape Delabra Court, Boynton Beach Florida, 33473.  (267) 939-2874

4. Andrew Baumhor's daughter and Larry Baumhor's granddaughter, Juliette Baumhor turned three years old on December 16, 2022, currently resides in Florida with Andrew and his wife Beth Baumhor at the aforementioned address.

5. The Plaintiff Larry Baumhor was denied visitation by The FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA with his granddaughter Juliette Baumhor once a month for two hours with the defendant Andrew Baumhor present at a venue chosen by the said defendant, order attached hereto, made part hereof and marked Exhibit "A".

6. The Plaintiff Larry Baumhor was denied visitation In The District Court of Appeal of The State of Florida Fourth District,

110 South Tamarind Avenue, West Palm Beach, Fl. 33401 with his granddaughter Juliette Baumhor once a month for two hours with the defendant Andrew Baumhor present at a venue chosen by the said defendant, order attached hereto, made part hereof and marked Exhibit "B."

**7.** The Plaintiff Larry Baumhor was denied visitation by Florida Supreme Court, 500 South Duval Street Tallahassee, FL 32399 with his granddaughter Juliette Baumhor once a month for two hours with the defendant Andrew Baumhor present at a venue chosen by the said defendant, order attached hereto, made part hereof and marked Exhibit "C."

**8.** The Plaintiff's First Amendment rights were violated by the Supreme Court of Florida and the State of Florida Fourth District Court. The Supreme Court of Florida stated "The Fourth District Court of Appeal on February 15, 2024, is hereby dismissed, This Court lacks jurisdiction to review an unelaborated decision from a district court of appeal that is issued without opinion or explanation or that merely cites to an authority that is not a case pending review in or reversed or quashed by, this Court."

**9.** The fact the Fourth District Court of Appeal refused to elaborate on a decision and the Supreme Court of Florida denied Mr.

Baumhor's appeal violates his First Amendment Right, "To petition

the government for a redress of grievances." **Amendment I**

"Congress shall make no law respecting an establishment of

religion, or prohibiting the free exercise thereof; or abridging the

freedom of speech, or of the press; or the right of the people

peaceably to assemble, and to petition the government for a redress

of grievances."

## ARGUMENT:

**752.011  "Petition for grandparent visitation with a minor child.**—A
grandparent of a minor child whose parents are deceased, missing, or in a
persistent vegetative state, or whose one parent is deceased, missing, or in
a persistent vegetative state and whose other parent has been convicted of
a felony or an offense of violence evincing behavior that poses a
substantial threat of harm to the minor child's health or welfare, may
petition the court for court-ordered visitation with the grandchild under this
section."

Statute 752.011 is punitive, attacking the individual freedom of
grandparents and antithetical to the liberty the United States has fought for
since the Revolutionary War. The Florida statute is blatantly narrow-
minded, prejudicial, and discriminatory, and attacks grandparents who were
part of a loving nuclear family that brought love, life, liberty, and happiness
to their children. And now the parents can give the same life, liberty, and
happiness to their children while the grandparents are forced into isolation
by the inhuman archaic Florida statute 752.011.


## CONSTITUTIONAL LAW

Statute 752.011 violates the Florida Constitution statute

SECTION 2. **Basic rights.**—All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

Larry Baumhor is being categorized, treated with prejudice and discrimination, and denied the "inalienable right to enjoy and defend life, liberty and to pursue happiness," as stated in the section of the Florida Constitution.

Florida statute 752.011 also violates the Fourteenth Amendment of the United States Constitution: **Section 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In applying Florida Statute 752.011, Judge Siperstein failed to consider that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Said statute deprives Larry Baumhor of privileges, immunities, and of life and liberty."

### CIVIL RIGHTS ACT OF 1964

Mr. Baumhor's civil rights as a grandparent are being discriminated against in the Florida Statute 752.011 thus violating The Civil Rights Act of 1964. "The Act prohibited discrimination in public places, provided for the

integration of schools and other public facilities, and made employment discrimination illegal based on race, color, religion, sex or national origin."

As a grandparent, a blood relative of Juliette Baumhor, statute 752.011 discriminates against all grandparents for receiving consideration for visitation such was the case of African-Americans who were categorized like grandparents and were punished because of the color of their skin. "And while many leaders at that time reminded the public that laws alone cannot shape "the hearts and minds" of people, the power of government through laws is a critical step to bring about change."

## DECLARATION OF INDEPENDENCE

The history of our country is based on freedom and that "all men are created equal." The Declaration of Independence clearly invokes that "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.–That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, –That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to affect their Safety and Happiness."

## STATUES IN OTHER STATES

Other states allow grandparents visitation with their grandchildren. **In Delaware § 2410. Persons eligible to petition for third-party visitation.**

(a) "Unless otherwise specified in this chapter, any adult person or persons may file a petition for a third-party visitation order regarding a child, not his, hers, or theirs against the child's guardians, parents, or DSCYF, provided that the adult person or persons can establish that the adult person or persons petitioning for visitation:

(1) Has a substantial and positive prior relationship with the child; or

(2) Is a grandparent, aunt, uncle, or adult sibling of the child."

Larry Baumhor's thirty-year loving relationship as stated in the introduction should be considered regarding visitation with his granddaughter Juliette.

**Montana's statute permits visitation between grandparents and grandchildren: 40-9-102.   Grandparent-grandchild contact.** (1) "Except as provided in subsection (8), the district court may grant to a grandparent of a child reasonable rights to contact with the child, including but not limited to rights regarding a child who is the subject of, or as to whom a disposition has been made during, an administrative or court proceeding under Title 41 or this title. The Department of public health and human services must be given notice of a petition for grandparent-grandchild contact regarding a child who is the subject of, or as to whom a disposition has been made during, an administrative or court proceeding under Title 41 or this title."

(4)   "Grandparent-grandchild contact granted under this section over the objections of a fit parent may be granted only upon a finding by the court, based upon clear and convincing evidence, that the contact with the grandparent would be in the best interest of the child and that the presumption in favor of the parent's wishes has been rebutted."

**In New Jersey,** visitation rights of grandparents **are controlled by a statute, N.J.S.A. 9:2-7.1.** If a parent denies a grandparent the right to visit with a grandchild, the grandparent has the right to make an application to the court for an order to compel visitation. The grandparent bears the burden of proving that visitation is in the best interest of the grandchild. That proof must be by "a preponderance of the evidence." This means the scales must tip in favor of visitation."

In making a decision the court must consider:

(6) the good faith of the grandparent in filing the application;
(8) any other factor relevant to the best interests of the child.

**North Dakota Century Code Section 14-09-06.2** allows grandparents, including great-grandparents, to be granted "reasonable visitation rights" if

the court finds that visitation would be in the best interests of the child and would not interfere with the parent-child relationship.

Universal Citation: 43 OK Stat § 43-109.4 (2014)

A. 1. **In Oklahoma** "pursuant to the provisions of this section, any grandparent of an unmarried minor child may seek and be granted reasonable visitation rights to the child which visitation rights may be independent of either parent of the child if:

a. the district court deems it to be in the best interest of the child pursuant to subsection E of this section

E. 1. In determining the best interest of the minor child, the court shall consider and, if requested, shall make specific findings of fact related to the following factors:

b. the willingness of the grandparent or grandparents to encourage a close relationship between the child and the parent or parents,

d. the love, affection and emotional ties existing between the parent and child,

j. whether the child is in a permanent, stable, satisfactory family unit and environment,

k. the moral fitness of the parties,

l. the character and behavior of any other person who resides in or frequents the homes of the parties and such person's interactions with the child,

m. the quantity of visitation time"

**Universal Citation:** RI Gen L § 15-5-24.3 (2012)

**In Rhode Island § 15-5-24.3 Visitation rights – Grandparents and siblings. –** (a) "The family court, upon miscellaneous petition of a grandparent for visitation rights with the petitioner's grandchild, and upon notice to both parents of the child and notice to the child, and after a

hearing on the petition, may grant reasonable rights of visitation of the grandchild to the petitioner.

(2) The court, in order to grant the petitioner reasonable rights of visitation, must find and set forth in writing the following findings of fact:

(i) That it is in the best interest of the grandchild that the petitioner is granted visitation rights with the grandchild;

(ii) That the petitioner is a fit and proper person to have visitation rights with the grandchild;

(iii) That the petitioner has repeatedly attempted to visit his or her grandchild during the thirty (30) days immediately preceding the date the petition was filed and was not allowed to visit the grandchild during the thirty (30) day period as a direct result of the actions of either, or both, parents of the grandchild;

(iv) That there is no other way the petitioner is able to visit his or her grandchild without court intervention; and

(v) That the petitioner, by clear and convincing evidence, has successfully rebutted the presumption that the parent's decision to refuse the grandparent visitation with the grandchild was reasonable."

## CASE LAW


**IN THE SUPREME COURT**

**STATE OF NORTH DAKOTA**

**2014 ND 83**

**Amanda E. Kulbacki, Plaintiff and Appellant**

**v.**

**Nicholas W. Michael, Defendant and Appellee**

No. 20130283, filed April 29, 2014. Nicholas W. Michael was self-represented. Ms. Kulbacki argued that the district court erred in awarding Mr. Michael's mother's grandparent visitation. The court affirmed the district court that section 14-09-05.1, N.D.C.C., is constitutional and that grandparent visitation under section 14-09-05.1, N.D.C.C., would not automatically end upon termination of Michael's parental rights. The Supreme Court ruled that the district court unconstitutionally placed the burden on Kulbacki to show grandparent visitation was not in the child's best interests.

"The district court determined Kulbacki failed to establish limited grandparent time would interfere with her relationship with her child and would be contrary to the child's best interests. The district court determined that if Michael's parental rights are terminated, the termination would not adversely affect the grandparent visitation accorded Coulter."

"Kulbacki argues section 14-09-05.1, N.D.C.C., is unconstitutional because no provision exists for deference to a custodial parent's decisions regarding grandparent visitation. The current version of section 14-09-05.1(1), N.D.C.C., requires that grandparent visitation "would not interfere with the parent-child relationship."

"Several other courts have concluded similar statutory language gives deference to a parent's decision regarding grandparent visitation. (South Dakota's grandparent visitation statute, requiring a court to find the grandparent visitation "would not significantly interfere with the parent-child relationship," is constitutional. and complies with the requirements set forth in Minnesota's visitation statute is "narrowly tailored by providing that before a court may order visitation, the court must find that visitation is in the best interests of the child and that, and whether the grandparent visitation would interfere with the parent-child relationship, is narrowly tailored to advance the State's compelling interest in promoting grandparent visitation while protecting the parents' right to parent their child. The statute passes constitutional muster under both the Federal and North Dakota Constitutions."

**In Ralph R. GRANT vs. Mary Grant, in Family Court, of the state of Delaware in and for New Castle County, decided November 7, 2017, file NO. CN15-06398**

"The Fourteenth Amendment of the United States Constitution contains "a substantive due process component" that protects "certain fundamental rights and liberty interests." [1] One of these fundamental liberty interests is the liberty interest of parents to make decisions concerning the care, custody, and control of their children.[2] The United States Supreme Court has stated that this interest "is perhaps the oldest of the fundamental liberty interests recognized" by the Court.[3] However, this interest is not absolute. Under certain state statutes, third parties may petition the court for visitation rights. But to protect parents' constitutional liberty interest, courts must grant "special weight" to parents' views on visitation and their children's best interests.[4] Although the Supreme Court has not defined "special weight," precedent "make[s] it clear that 'special weight' is a very strong term signifying extreme deference.""

"Accordingly, under Delaware's Third Party Visitation statute, 13 Del. C. § 2412 ("Section 2412"), when a parent objects to a third party's request for visitation, "the parent's determination of the child's best interest will prevail unless the nonparent seeking visitation proves that:  (1) visitation is in the child's best interest; the parent's objections are unreasonable by clear and convincing evidence;  and (3) visitation will not substantially interfere with the parent-child relationship by a preponderance of the evidence.""

In this case, the grandparents petitioned for visitation rights. "The court believed that visitation in such a controlled environment, and under the supervision of a trained professional, would minimize the parents' concerns and render their objections "clearly unreasonable." There was no evidence submitted in this case that supervised visitation would interfere with the parent-child relationship."

"The court wrote that, "given the negative past comments from Grandparents and the increased discord caused by over three years of estrangement, the Court cannot find Parents' concerns that Grandparents

would act in ways that undermine them as parents to be clearly unreasonable."

"The Family Court believed that Parents' objections to visitation would be unreasonable if the visitation were to "take place in a supervised, therapeutic setting" where a professional would "assist in reintroducing the children to Grandparents in a way that is safe and that prioritizes the children's emotional needs." [48] In such a setting, the Family Court believed the professional could monitor "anything negative or unhealthy" and interfere where necessary."

The Supreme Court of Delaware ruled that Family Court erred in its decision.

Larry Baumhor argues that Andrew and Beth Baumhor's objections to visitation are blatantly unreasonable, without merit, revengeful, and could severely harm Juliette as she continues to mature.

The minor child in question has one grandfather i.e., Larry Baumhor. Beth's father and Juliette's other grandfather is deceased. Mr. Baumhor has health problems that have been exacerbated by Andrew's treatment of Mr. Baumhor. To deprive Juliette of a loving relationship with her grandfather is tantamount to depriving her of a loving experience that will benefit her development, expand her mind, and bring her joy, happiness, and fond memories for life.

Andrew Baumhor states that he has a laundry list of complaints that Mr. Baumhor said after the argument about not allowing Mr. Baumhor's guests to Andrew's wedding. Mr. Baumhor also has a laundry list of complaints against Andrew that profoundly affected and hurt Mr. Baumhor. Mr. Baumhor apologized to Andrew for the things he said, but to no avail. For Andrew to hold grudges against Mr. Baumhor is detrimental to the development and well-being of his daughter Juliette Baumhor.

In a common-sense request, Larry Baumhor requests that your Honorable Court null and void comments made by both Andrew and Larry Baumhor during said argument as they are irrelevant to visitation with Juliette Baumhor and pure hyperbole.

**Richard BLAKELY and Carol Blakely, Respondents, v. Dean BLAKELY and Shelly Blakely, Appellants, No. SC 83307.**

"Dean and Shelly Blakely (Parents) refuse to permit Dean's parents, Richard and Carol Blakely (Grandparents), to visit with their grandchildren. The circuit court entered a judgment granting Grandparents two hours of visitation every 90 days, pursuant to section 452.402, RSMo 2000."

the court entered its judgment refusing the extensive visitation Grandparents requested, but granting limited visitation pursuant to the requirements of section 452.402, which states:

**A. "The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary orders to enforce the decree. The court may grant grandparents visitation when: .... (3) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days."**

**B.** "The court shall determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair the child's emotional development. Visitation may only be ordered *540 when the court finds such visitation to be in the best interests of the child. The court may order reasonable conditions or restrictions on grandparent visitation."

**"In accordance with these statutory requirements and Grandparents' request for factual findings on the statutory factors and constitutional claims, the trial court specifically found Parents had denied visitation for more than 90 days, the denial was unreasonable, and it was in grandchildren's best interests that Grandparents be awarded reasonable visitation. It rejected Parents' constitutional objections. Balancing the parties' interests, and apparently mindful of prior case law interpreting the statute, it granted Grandparents "two hours of visitation with the minor children on the third Sunday of the months of February, May, August and November of each year," that is, two hours of visitation every 90 days, including travel time. Parents were permitted to be present during the visits, which would not occur at Grandparents' house."**

Contrary to the Parents' argument, for the many reasons set out earlier, the provisions of the Missouri statute are fundamentally different from those of the statute disapproved in Troxel. Moreover, in Herndon, this Court did

exactly what the Washington Supreme Court declined to do in Troxel" give [the nonparental visitation statute] a narrower reading ...". Troxel, 530 U.S. at 67, 120 S. Ct. 2054. Herndon held that the statute contemplates *544 only "occasional, temporary visitation, which may only be allowed if a trial court finds visitation to be in the best interest of the child and does not endanger the child's physical or emotional development." 857 S.W.2d at 209 (emphasis added). Similarly, Herndon ruled that the statute permitted only a "minimal intrusion on the family relationship and ... [was] ... narrowly tailored to adequately protect the interests of parents and children." Id. at 210 (emphasis added). It emphasized that "if the statute allowed a great amount of visitation we would be more likely to find an undue burden on the family and hold that these subsections are unconstitutional." Id. at 210-11.

"We here reaffirm the narrow interpretation of Missouri's statute adopted in Herndon and other Missouri cases following it,[4] and hold that, as so interpreted, it comports with the standards set out in Troxel. Missouri's statute avoids the sweeping breadth of the Washington statute in many ways. First, in contrast to Washington, which allowed visitation to any noncustodial person, Missouri limits visitation to "the grandparents of the child ...". Sec. 452.402.1. Consequently, the statute "does not create the potential of subjecting parents' every decision to review at the behest of endless third parties." In re G.P.C., 28 S.W.3d 357, 364 (Mo.App. E.D.2000).

In addition, unlike Washington, Missouri's legislature has balanced the interests involved and provided that to be entitled to visitation, grandparents must meet the threshold requirement of demonstrating that parents have "unreasonably denied" visitation for a period exceeding 90 days. Sec. 452.402.1(3). The fact that no visitation can be ordered unless the parents have entirely denied visitation for a period of 90 days provides the second important distinction between the two statutes. This Court has previously noted that the 90-day period of "unreasonable denial of visitation that must elapse before a court may enter an order under section 452.402 indicates the legislature contemplated an allowance of minimal visitation subject to reasonable restrictions and conditions as a court might find appropriate." Herndon, 857 S.W.2d at 210."

"Applying these principles and the statutory factors, here, the Court finds the trial court did not err in ordering limited visitation. Parents have entirely prevented Grandparents from visiting and otherwise associating with

grandchildren for over one year, unlike Troxel, in which the mother's counsel conceded she consented to monthly visitation and only contested "how much and how it is going to be structured." 530 U.S. at 71, 120 S. Ct. 2054. The court specifically found this constituted an unreasonable denial of visitation for over 90 days, and, further, that "[i]t is in the best interest of the minor children that [Grandparents] be awarded reasonable visitation of their minor grandchildren." It crafted a visitation order that was very narrowly drawn to accomplish only a minimal intrusion on the parental rights of Parents, and which comported with the "occasional, temporary visitation" Herndon recognized comes within the constitutional safe-harbor of the Due Process Clause. 857 S.W.2d at 209."

"While Parents suggest that the trial judge should have made more detailed findings as to the reasons for its decision, the statute does not so require and Parents did not timely request such findings, although entitled to do so under Rule 73.01. Grandparents did request three basic findings of fact as to the presence of the factors set out in the statute, and the court made each requested finding. The court's order here adequately demonstrated it complied with the statute in finding that Parents had unreasonably denied visitation before granting Grandparents limited visitation of two hours every 90 days."

"For the reasons set out above, the judgment is affirmed."

**Larry Baumhor's illness should be given the same deference in Florida Statute 752.011 in that grandparents can petition the court for visitation if their son or daughter is deceased.**

The 15th Circuit court refers to the Petitioner lacking inherent authority to award visitation to a non-parent, which consists of a statutory right. Forbes v. Chapin, 917 So. 2d. 948, 953 (Fla. 4th DCA 2005). However, pursuant to section 752.011, Florida Statutes, a grandparent may file a petition for court-ordered visitation " &752.011.of a minor child whose parents are deceased, missing or in a persistent vegetative state."

Petitioner, Larry Baumhor meets the criterion of statute &752.011 because of being on dialysis, waiting for a kidney transplant from the University of Pennsylvania and suffering from other major health issues. On August 17, 2022, Larry Baumhor had double bypass heart surgery. On Monday, March 20, 2023, Larry had a massive heart attack and had three stents placed in his right coronary artery.   His life expectancy on dialysis is three years. Larry Baumhor pleads with the court for compassion to visit with his granddaughter before he dies and that statute &752.011  should be applicable to the petitioner who is facing a death sentence the same as a parent who then the court would allow visitation to said, grandparent.

When the minor child is of age inquiring about why her grandfather was unable to visit with her and discovers Petitioner did not meet the statutory right of Forbes v. Chapin, 917 So. 2d 948, 953 (Fla. 4th DCA 2005), Juliette Baumhor will become perplexed, confused, and deeply scared. This clearly is not in the best interest of the minor child.

10.  Larry Baumhor shared custody with Andrew's mother until Andrew was sixteen years old. From the age of sixteen to the age of twenty-six, Andrew lived with his father Mr. Baumhor full-time. Andrew's mother Lynne was institutionalized twice and in jail on two occasions when Andrew was 16 years old. Andrew's mother Lynne was going through a volatile divorce with her husband and attempted to put Andrew in the middle of this horrendous battle. Andrew's mother Lynne was verbally and emotionally abusive towards Andrew. Mr. Baumhor removed Andrew from his mother's house. Andrew's mother Lynne took away Andrew's car, health insurance from the teacher's union, (court-ordered) and dog. Lynne Baumhor stole twenty-five thousand dollars from Andrew left to him by his grandfather Philip Altus in his will. Larry Baumhor

researched the will and retained an attorney for Andrew who
received some of the money back in a settlement negotiated by
Andrew's lawyer.

Mr. Baumhor bought Andrew a new car and secured health
insurance for him. Andrew moved in with Mr. Baumhor full-time.

11. Until the age of thirty Andrew and his father Mr. Baumhor had a
strong loving father-son relationship. Andrew and Mr. Baumhor
attended most of the Temple University basketball games. In 1988
Mr. Baumhor was attending Temple University. On occasion,
Andrew would go to class with Mr. Baumhor. Andrew met and was
friendly with some of the Temple basketball players, including
coach John Chaney. Through the years Mr. Baumhor and Andrew
attended the Big Five games at all the universities in Philadelphia,
including the Palestra. Mr. Baumhor took Andrew's friends to some
of the games and had birthday parties for Andrew at *McGonigle*
Hall and the *Liacouras* Center. Andrew and Mr. Baumhor attended
some of the Atlantic Ten away playoff games.

12. Mr. Baumhor and Andrew would either drive or fly somewhere in
the U.S. from Maine to CA during the summer. They attended
many professional baseball games in other cities. Andrew and Mr.
Baumhor attended a World Series game at Yankee stadium. They
also were at two 76er's vs. Laker's championship games, the
Phillies Playoff game, and Eagles playoff games. They visited
Disneyland and Disneyworld, snorkeled in the Florida Keys,

explored caves together, visited many museums, and attended the Yankees World Series.

13. Mr. Baumhor coached Andrew's Little League teams in baseball and basketball. They attended many Broadway and off-Broadway shows in NYC, including the magician David Copperfield's show. On occasion, Mr. Baumhor would include one of Andrew's friends. Mr. Baumhor taught Andrew how to play tennis. Andrew won the Philadelphia Playground Championship, won a trophy, and was written up in the newspaper. Andrew and Mr. Baumhor attended many tennis matches at the U. S. Open in NY. Mr. Baumhor and Andrew went on many fishing expeditions both fresh water and saltwater. Some of Andrew's friends would join them on fishing trips. Andrew would have sleepover parties with his friends at Mr. Baumhor's apartment. Mr. Baumhor created a surprise twenty-first birthday party for Andrew.

14. When Andrew and other students were being bullied by his teacher at Lower Moreland High School, Mr. Baumhor had a meeting with his teacher and principal. He also sent a letter to the school superintendent to rectify this matter.

15.   When Andrew was ten years old, Mr. Baumhor turned off the sound to a live sporting event on T.V. and Andrew would broadcast into a boombox using a microphone. They would playback the tape. Andrew's sports broadcasting career began at 10 years old. Mr. Baumhor immediately realized Andrew was naturally talented and filled with passion. He loved broadcasting sports. From an

early age, Mr. Baumhor encouraged Andrew and eventually helped Andrew achieve this goal.

16.  Mr. Baumhor helped and directed Andrew's quest for the best Broadcast Journalism college. Andrew was an A student strong in math but weak in writing skills. After Andrew graduated from high school (the summer before college) Mr. Baumhor would work with Andrew to sharpen his writing skills. Andrew would write stories and summarize sports articles in the newspaper. Mr. Baumhor would explain to Andrew how he can improve his writing skills.

17.  Mr. Baumhor and Andrew drove to various colleges on the east coast to determine what school Andrew liked the best. Mr. Baumhor discussed with Andrew each university's curriculum in Broadcast Journalism. Andrew chose American University in Washington, D.C. Andrew was also accepted as a transfer student to the Newhouse School of Broadcasting as a transfer student at Syracuse University, (the number one program in the world for sports broadcasting). Mr. Baumhor and Andrew drove to Syracuse to visit the department, spoke with the educators and the students broadcasting at the Newhouse School. Andrew decided to stay at American University.

18.  At American University in Washington, D.C. Mr. Baumhor would visit Andrew during a sporting event he was broadcasting and then take him out to dinner. Andrew became Director of Broadcasting. He was broadcasting basketball, soccer and lacrosse live on the Internet and television. He also had a sport's radio and T.V. show.

Mr. Baumhor recorded most of Andrew's broadcasts. He was creating an archive for resume packages and for Andrew to enjoy throughout his life.

19.   In Andrew's senior year at college, Mr. Baumhor researched and produced his resume package that included audio and videotapes of Andrew broadcasting and mailed 300 packages to potential employers. The day Andrew graduated from college; he had a paid job broadcasting in a baseball summer league in NC. Mr. Baumhor found an agent to represent Andrew. After the summer job, Andrew was employed in Oklahoma, broadcasting sports. He then worked at ESPN, and Major League Baseball as an executive producer. None of this was possible without the efforts of Mr. Baumhor. So Your Kid Wants To Be A Sportscaster, authored by Larry Baumhor is a tribute to Andrew on how Mr. Baumhor helped Andrew achieve success in sports broadcasting.

20.   While working at Major League Baseball for seven years, Andrew won six Emmys as an executive producer for a sports talk show. After winning his first Emmy, Mr. Baumhor was elated and proud of Andrew. During this time Andrew was living in New York and Edison, N.J. After Andrew won his first Emmy, Mr. Baumhor pleaded with Andrew to physically see the Emmy and take some photos. Andrew promised he would show the Emmy to Mr. Baumhor. Andrew who was living with his future wife in Edison, NJ would visit his future in-laws in the Philadelphia area. Time and time again he promised to visit Mr. Baumhor with the Emmy.

Sometimes Andrew didn't even call Mr. Baumhor to say he wasn't coming. He just didn't show up. Mr. Baumhor stopped asking Andrew to show him the Emmy. God forbid, Mr. Baumhor should disturb Andrew, the delicate genius. Finally, after four months, Mr. Baumhor and Andrew met and shared the experience of winning his first of six Emmys. Mr. Baumhor was deeply hurt as he knew he was part of this phenomenal event, something out of a fantasy. Andrew Baumhor became so popular that his professor at American University asked Andrew to visit with his Emmy and speak in the school of Broadcast Journalism.

21.   In February 2014, Mr. Baumhor had prostate cancer surgery and was treated by Dr. Eun at Temple University. Mr. Baumhor was obese and Dr. Eun was the only doctor in Philadelphia and the suburbs willing to operate on Mr. Baumhor because of potential complications due to his weight. Mr. Baumhor was in the hospital for about two weeks and was home convalescing for two months. Mr. Baumhor asked Andrew to come to the operation. Andrew refused. Mr. Baumhor asked Andrew to sleep over at his apartment and help him. He refused. Andrew was working at Major League Baseball at this time and refused to take off work to help Mr. Baumhor. Mr. Baumhor was very ill; bleeding, in pain, in diapers, and on a catheter. Mr. Baumhor's friend Harris Kramer stayed with Mr. Baumhor in the hospital during the operation. As a result of complications, Mr. Baumhor had two prostate surgery operations. Harris Kramer would buy food and diapers for Mr. Baumhor while he was home for two months recovering. Mr. Baumhor pleaded

with Andrew for help but he refused. On one occasion Andrew was in Philadelphia visiting his mother but refused to visit with Mr. Baumhor. During the two and a half months of Mr. Baumhor's recovery, Andrew visited three times and stayed for a very short period.

22. In 2014 while recovering from prostate surgery, Andrew came to visit. Mr. Baumhor's friend Harris was also at the apartment. We began speaking about Andrew's wedding when he informed Mr. Baumhor that he was not allowed to bring any guests to the wedding. "What about Harris, Mr. Baumhor asked"? "No, he can't come," responded Andrew. Harris was taking care of Mr. Baumhor after his prostate surgery. A job Andrew should have been doing. Mr. Baumhor was informed that his mother, Andrew's grandmother, could not bring any guests. Andrew's grandmother gave Andrew her diamond ring valued at $11,000.00 to give to Beth for her engagement.  Andrew's mother was allowed to invite about ten friends and ten relatives. During Andrew's courtship with Beth, Andrew's mother Lynne became friendly with Beth's parents. Mr. Baumhor was devastated. When Andrew left the apartment, Mr. Baumhor broke down hysterically crying in front of Harris. Andrew's in-laws are extremely wealthy and invited over two hundred people to an elaborate wedding at an expensive facility in downtown Philadelphia. They owned houses in Margate, NJ, Newtown, PA, and in Florida near Fort Lauderdale. Jeff Magill owned a steel business and was hugely successful.

23.    Andrew Baumhor refuses all communication with his father Mr.
Baumhor, including phone calls and emails. Mr. Baumhor did not
know that Andrew's wife gave birth to Juliette. Mr. Baumhor was
informed by their cousin that he was a grandfather. Mr. Baumhor
used his stimulus check to buy his granddaughter $400.00 in books
at Barnes & Noble. He gift-wrapped all the presents and signed the
inside of the books with a note to Juliette. Mr. Baumhor also hired
an artist to paint a portrait of Juliette. A-frame shop matted the
painting and used an antique frame. He mailed the painting to
Andrew. No response. Mr. Baumhor tried to call Andrew. No
response. Mr. Baumhor's mother, Andrew's grandmother, informed
him they received the presents and Andrew would read the books
to Juliette.

24.    Andrew Baumhor is deliberately and maliciously with intent to
harm denying Mr. Baumhor visitation with Juliette. Mr. Baumhor
tried to contact Andrew and asked if he could visit Juliette. No
response.

25.    Mr. Baumhor requests your Honor to grant him visitation for two
hours one day a month to visit his granddaughter at Andrew's
house. The time and day of the month can be determined by
Andrew. Andrew can invite any friend or relative to be present
during Mr. Baumhor's visitation. This is an extremely reasonable
request.

26.   Mr. Baumhor is willing to fly to Florida from Philadelphia to visit his granddaughter. Mr. Baumhor has limited money from social security, ($1,295.00 per month). He has no other resources.

27.   Mr. Baumhor requests that he be allowed to speak via the telephone at the hearing. Mr. Baumhor has limited funds and health issues, recently had open heart bypass surgery, is on dialysis waiting for a kidney transplant. It would put a tremendous undue burden on Mr. Baumhor both financially and health-wise to continually fly to Florida for hearings in Family Court that could also involve appellate hearings.

28.   The minor child in question has one grandfather i.e., Mr. Baumhor. Beth's father and Juliette's other grandfather is deceased. Mr. Baumhor has health problems that have been exacerbated by Andrew's treatment of Mr. Baumhor. To deprive Juliette of a loving relationship with her grandfather is tantamount to depriving her of a loving experience that will benefit her development, expand her mind, and bring her joy, happiness, and fond memories for life.

29.  Andrew Baumhor states that he has a laundry list of complaints that Mr. Baumhor said after the argument about not allowing Mr. Baumhor guests to Andrew's wedding. Mr. Baumhor also has a laundry list of complaints against Andrew that profoundly affected and hurt Mr. Baumhor. Mr. Baumhor apologized to Andrew for the things he said, but to no avail. For Andrew to hold grudges against

Mr. Baumhor is detrimental to the development and well-being of his daughter Juliette Baumhor. In a common-sense request, Mr. Baumhor prays to your Honorable Court to null and void comments made by both Andrew and Mr. Baumhor during said argument as they are irrelevant to visitation with Juliette Baumhor and pure hyperbole.

WHEREFORE, Mr. Baumhor prays your Honorable Court to grant him two hours of visitation once a month with his granddaughter, Juliette at a convenient time for Andrew.

Respectfully yours,

Larry Baumhor

**VERIFICATION**

The facts contained in the foregoing petition are true and correct and meet the requirements of Florida statute 99.097 verification of signatures on petitions.

Larry Baumhor, Pro Se

# CERTIFICATE OF SERVICE

I, Larry Baumhor, hereby certify that service of the foregoing document upon Andrew Baumhor, 10533 Cape Delabra Court, Boynton Beach, Florida, 33473 the Defendant, satisfies the requirements of Florida Supreme Court Family Law Form 12.914 and certificate of service in Florida 17 c.f.r. § 201.151(d)

Larry Baumhor, Pro Se Plaintiff

Filing # 169801646 E-Filed 03/28/2023 12:39:28 PM

CFN 20230104962
OR BK 34208 PG 1959
RECORDED 3/30/2023 9:06 AM
Palm Beach County, Florida
Joseph Abruzzo, Clerk
Pgs: 1959 - 1960; (2pgs)

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

LARRY BAUMHOR,
    Petitioner

vs.

ANDREW BAUMHOR,
    Respondent.
                /

FAMILY DIVISION: FC
CASE NO.: 50-2023-DR-001545-XXXX-MB

EXHIBIT "A"

## ORDER DISMISSING PETITION WITHOUT PREJUDICE

    **THIS CAUSE** came before the Court *sua sponte*. On February 23, 2023, Larry Baumhor ("Petitioner") filed a Petition for Visitation with Minor Child ("Petition"). (D.E. #3). The Court has carefully reviewed and considered the Petition, case file, and applicable law.

    Petitioner requests visitation with the minor child subject to the proceeding, J.B. ("Minor Child"). He represents Minor Child to be his grandchild. Petitioner also asserts that Minor Child resides with Andrew Baumhor and Beth Baumhor, the parents of Minor Child.

    A court lacks inherent authority to award visitation to a non-parent, which consists of a statutory right. *Forbes v. Chapin*, 917 So. 2d 948, 953 (Fla. 4th DCA 2005) (citation omitted). However, pursuant to section 752.011, Florida Statutes, a grandparent may file a petition for court-ordered visitation "of a minor child whose parents are deceased, missing, or in a persistent vegetative state". § 752.011, Fla. Stat. In addition, if "one parent is deceased, missing, or in a persistent vegetative state and…[the] other parent has been convicted of a felony or an offense of violence evincing behavior that poses a substantial threat of harm to the minor child's health or welfare" then a grandparent may likewise request to establish visitation through the court. § 752.011, Fla. Stat. This Court finds that Petitioner has failed to allege any circumstances in

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 03/28/2023 12:39:28 PM

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED IN THE OFFICE OF THE PALM BEACH COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER. THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.
VISIT https://.....

Digitally signed by The Honorable Joseph Abruzzo
Date: 2023.06.15 11:00:02 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach ...

Unique Code : BAA-CACCCFAICABFEE-BCAJJ-CACDABAEJGC-CCCEEF-F Page 1 of 2

CFN 20230104962
OR BK 34208 PG 1960
Pg: 2 of 2

accordance with section 752.011, Florida Statutes, which would permit compelled visitation with Minor Child.

Accordingly, it is hereby

**ORDERED** that the Petition (D.E. #3) is **DISMISSED** without prejudice as legally insufficient.

**DONE AND ORDERED** in Chambers, in West Palm Beach, Palm Beach County, Florida.

502023DR001545XXXXMB   03/23/2023
Caryn Siperstein   Judge

502023DR001545XXXXMB   03/23/2023
Caryn Siperstein
Judge

**Copies provided to:**

| Name | Address | Email |
|---|---|---|
| ANDREW BAUMHOR | 10533 CAPE DELABRA COURT BOYNTON BEACH, FL 33473 | |
| LARRY BAUMHOR | 2006 GRIFFITH ST PHILADELPHIA, PA 19152 | |

2

*EXHIBIT "B"*

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT, 110 SOUTH TAMARIND AVENUE, WEST PALM BEACH, FL  33401

October 12, 2023

| | |
|---|---|
| LARRY BAUMHOR,<br>                Appellant(s)<br><br>v.<br><br>ANDREW BAUMHOR,<br>                Appellee(s). | **CASE NO. - 4D2023-1287**<br>L.T. No. - 502023DR001545 |

**BY ORDER OF THE COURT:**

ORDERED that, upon consideration of appellee's October 4, 2023 response, appellant's August 28, 2023 motion is treated as a motion to foreclose the filing of the answer brief and is denied. Fla. R. App. P. 9.210(g), 9.300(a).  Further,

ORDERED that appellant's October 11, 2023 "response to the motion to grant visitation; denying the defendant's answer" is stricken as unauthorized.

Served:
Andrew Baumhor
Larry Baumhor

CT

**I HEREBY CERTIFY** that the foregoing is a true copy of the court's order.

**LONN WEISSBLUM, Clerk**
**Fourth District Court of Appeal**
4D2023-1287 October 12, 2023



*EXHIBIT "C"*

# Supreme Court of Florida

### MONDAY, MARCH 11, 2024

Larry Baumhor,
      Petitioner(s)

v.

Andrew Baumhor,
      Respondent(s)

**SC2024-0348**
Lower Tribunal No(s).:
4D23-1287;
502023DR001545XXXXMB

---

Petitioner's Notice to Invoke Discretionary Jurisdiction, seeking review of the order or opinion issued by the Fourth District Court of Appeal on February 15, 2024, is hereby dismissed. This Court lacks jurisdiction to review an unelaborated decision from a district court of appeal that is issued without opinion or explanation or that merely cites to an authority that is not a case pending review in, or reversed or quashed by, this Court. *See Wheeler v. State*, 296 So. 3d 895 (Fla. 2020); *Wells v. State*, 132 So. 3d 1110 (Fla. 2014); *Jackson v. State*, 926 So. 2d 1262 (Fla. 2006); *Gandy v. State*, 846 So. 2d 1141 (Fla. 2003); *Stallworth v. Moore*, 827 So. 2d 974 (Fla. 2002); *Harrison v. Hyster Co.*, 515 So. 2d 1279 (Fla. 1987); *Dodi Publ'g Co. v. Editorial Am. S.A.*, 385 So. 2d 1369 (Fla. 1980); *Jenkins v. State*, 385 So. 2d 1356 (Fla. 1980).

No motion for rehearing or reinstatement will be entertained by the Court.

Petitioner's motion for leave to proceed in forma pauperis is hereby denied as moot.

A True Copy
Test:

SC2024-0348 3/11/2024

John A. Tomasino
Clerk, Supreme Court

